We're back on record. And for the record, the remaining case is, I think we have two case numbers. I'm going to need to make sure I recite the right one. It's United States v. Is it Sarkissian? Is that the correct pronunciation? That's close enough, Your Honor. Well, if I've got it wrong, do you want to pronounce it? Well, I usually do Sarkissian, but... Sarkissian. Okay, thank you. And I think your case is 16-50347. Have I got that right? Right. Okay, great. Thanks very much. One second. Okay, looks like we're ready to hear your argument. Good morning, Your Honors, and may it please the Court. Charles Snyder here on behalf of Appellant Karen Sarkissian. I'm going to do my best to reserve four minutes. Your Honors, the way that I thought that I could be most helpful today is by narrowing my focus and spending as much time as possible talking about one issue as it applies to one witness. Because while I think that we have a number of winning arguments, both on the substantive counts and that sentencing, ultimately, at the end of the day, the Barabin issue as it applies to Special Agent Keith Koontz is clean, it's clear, it requires reversal on every count, and it drives the outcome of this appeal in Mr. Sarkissian's favor. In talking about Barabin, I want to spend as much time as possible talking about the prejudice that Special Agent Koontz's testimony caused, because I think that's where I can be most helpful today. If I have additional time, I want to turn and talk about the government's improper rebuttal argument, which has a natural affinity with Special Agent Koontz's wrongly admitted testimony. As we explained in our briefing, Special Agent Koontz's testimony, in part, set out the government's trial theory, which turned on this ecosystem of health care fraud and money laundering fueled by the payment of cash kickbacks. He also explained how the jury could infer the kickbacks had occurred even without direct proof. And then that improperly admitted testimony met up with the government's rebuttal argument when, in closing, the government referred to kickback evidence that didn't exist. Counsel, your time is ticking, and I'm just a little concerned you're doing what your brief did, but it's almost like we don't know where to begin. Can you prioritize and tell us what are your most important arguments in terms of what do you think is the most prejudicial evidence that was admitted that ought not to have been admitted? Of course. So the most prejudicial evidence that was admitted was Special Agent Koontz's testimony, which was wrongly admitted under Barabin. And if you'd like, I want to go to prejudice right now. Does that make sense? Okay. So in talking about Special Agent Koontz's testimony in prejudice, the first thing to say, and I'll just say it and let it go because it's in our briefing, is that he's a doubly dangerous witness. He's testifying as both an agent and as a law enforcement expert, so his testimony is likely to get special credence with the jury. The second high-level point is that he was a framework or a backbone witness. His testimony was critical to the government both for what it did on its own, but also for the way that the government used it to tie up the other circumstantial pieces of evidence and to give that evidence inculpatory significance. And I think the way to think about his testimony was that it mapped onto the two things that the government had to prove, which were, broadly speaking, that there was fraud occurring at the Sunset Clinic, and not just with respect to the charged patients because Sarkeesian had nothing to do with them, but that it was occurring more broadly so that the government could wrap Sarkeesian as the office manager in, and also that he had the knowledge and intent. So we've identified four broad categories of his testimony, which goes to your question of prejudice. Those categories are the red flags of health care fraud, the supposed role that office managers play in fraudulent clinics, his explanation of the government's trial theory, this ecosystem of health care fraud and money laundering, and then his explanation to the jury about inferring kickbacks even without evidence. So wait, three is ecosystem and four is what? His testimony about inferring that kickbacks had occurred even if they didn't have, quote, direct evidence. All right.   Thank you. So I'm going to set three and four aside for now and just focus on the red flags and his testimony about the role of office managers. So the red flags of testimony. I think it's important to keep in mind that this was offered not accidentally right at the beginning of the case. And what the government did with this, Your Honors, was that it used Special Agent Koonce's testimony to explain to the jury why the circumstantial evidence that it was going to hear from the other witnesses, although seemingly innocuous or ambiguous, actually had criminal significance. And that's not my characterization. That's the government's opposition to the motion at lemonade. At government excerpt of record, page 95, and explaining the importance of this testimony, the government said, because these fraud schemes often involve a combination of seemingly innocuous facts, this testimony, the red flags testimony, is particularly helpful to a jury which may be unfamiliar with complex health care fraud schemes, including the money laundering components present here. The average juror is unlikely to have an understanding of how these complex fraudulent schemes operate. Special Agent Koonce's testimony will assist the jury in contextualizing these complex interactions and seemingly innocuous facts. So what were the red flags? So the red flags, we've laid them out in our brief, Your Honor. Office manager. Can you just tick them off? I can. So we actually set out a chart in our brief. Well, if you want to incorporate that, we're very familiar with that. Is that your? Yeah, those are the red flags. And actually, you can see what the government did in its closing. So what the government did in its closing is it returned back to this red flags testimony. And at the beginning of its summation, it said, Special Agent Koonce told you what to look for to see that fraud had occurred and Sarkeesan was involved in it. And then it went in and it ticked off all of those factors. And we've quoted that portion in our opening brief, Your Honor. And then it said, now, what was happening at the Sunset Clinic? And it started measuring all of the fact evidence back against the Koonce test to see whether or not they had proved their case. And that's really important because when you're on harmless error analysis, the way that you do it is not by, as the government suggests, surgically removing Koonce, throwing him out, and seeing whether what you have left supports the verdict. You have to look at the way his testimony affected the case on its own, but also how it affected all of the other evidence. And so when the government uses inadmissible law enforcement expert testimony to tie up the circumstantial strands and give them criminal significance, that spreads the detain all over everything. It's like exploding an ink pack on the evidence. Right. I think we understand that argument, and it's a concerning one. What was the jury told about how to treat this testimony? In terms of the specific jury instruction with respect to Special Agent Koonce? Well, any jury instruction. What was the jury instructed about how to interpret this testimony? I know that, and sorry, the fully accurate answer is that I don't exactly know what the specific jury instruction is. I know that they got an expert instruction, and they, of course, got the normal instruction about interpreting circumstantial evidence. But other than that, I don't know that there was a specific jury instruction. As far as you know, were there pattern jury instructions? The pattern jury instruction was more or less followed, other than with respect to the dual role testimony. But, yes. Okay. So what were they told about what form of evidence Koonce's testimony took? They weren't actually told about what form of evidence it took. So what the instruction was, was that you've heard testimony from persons in this case who, based on their training and experience, are experts. That's it. Right. But, right. But that's the point, isn't it? There's no dual instruction, and there isn't any kind of an indication about whether Koonce was or was not a lay witness or an expert witness or what to do with it, with his testimony. Isn't that the problem? I mean, that's one of the problems. It's one of the many problems, Your Honors. But, I mean, I think in looking at – Well, it seems contradictory. So I'm not trying to hide the ball. It's just that you're arguing that a danger, and we're always concerned about expert testimony, being given too much weight. Right. Right. And so, on the other hand, you're also arguing that a dual instruction wasn't given, and so how do we know how the jury really treated this person's testimony? Right. So I think there are different ways that you can look at it. You know, I actually don't think the instruction matters as much as the way that the case was presented at trial. So what – Well, is it your position that this guy was presented as an expert? And I don't mean to be disrespectful, I should say, Mr. Koonce. Is it your position that he was presented as an expert or as a lay witness? He was presented as an expert, fully as an expert. All right. So that's our position. And that's what the error was with respect to Berravent, right, because of the failure to make findings. And so if I can return back to prejudice. Yes, of course. So, I mean, and hopefully this speaks to your question, which is when you use an expert to tie up all the circumstantial evidence, right, it creates prejudice because you've now affected all the other pieces of evidence. And this is actually something that Judge Tsushima, I know you'll be familiar with, given your participation in Wells, which is a case that we cited in our brief, where the government did the exact same thing. They used inadmissible law enforcement expert testimony to tie up a bunch of circumstantial strands. And there was criminal profile evidence. And here it's circumstantial evidence of health care fraud and money laundering. And what the court said in that case was that where the government's theory, quote, depended on the intertwining of multiple strands of evidence, end quote, and the inadmissible law enforcement expert testimony was, quote, instrumental in tying those strands together, that the court wouldn't hesitate and there it didn't hesitate to find prejudice. And so that's, in some ways, why I think that the instruction is less of an issue than the way that his testimony was presented in the case. So he was set up as this expert, the person who's going to give you a unified theory of the circumstantial evidence that you look for for health care fraud and money laundering. The government then returns back to that in closing and says, Special Agent Koonce told you what to look for to see whether these things have been proven. And then they used the fact evidence to measure against that. The other thing I want to say is that, you know, for as much as the government, you know, postures about having this very strong case against Mr. Sarkeesian, at the end of the day, it was a circumstantial case that depended on interpreting those circumstantial strands of evidence in the way that Special Agent Koonce told the jury. So here are the people that didn't testify at trial. Dr. Bascoy, the doctor associated with the clinic. Latanya Smith, the physician's assistant with whom Sarkeesian was supposedly conspiring. Arturo, the marketer to whom he supposedly paid kickbacks. The biller, whose name just escaped me, but the biller inside the office, who was supposedly engaged in the fraudulent billing. Hakobayan and Oramian, the people with whom he was supposedly laundering money. So anyone that would have any direct knowledge, if the government's theory is right, of Mr. Sarkeesian's unlawful conduct, didn't testify at trial. The doctor was deceased? The doctor was deceased, but I think the point is the government has the burden to put all this evidence before the jury or the best evidence that it has. Yes, I'm just trying to make clear that you can't fault, and I don't think you were faulting the government. No, I'm not. I'm not faulting the government, but I'm just going to point out that this was a circumstantial case. And the people who testified about what was actually going on in the clinic were the clinic employees. And what they said was that, number one, that it was actually a real clinic that performed real services. Well, the jury heard testimony that folks were coming into the clinic and seeing a physician's assistant rather than a doctor, that at least one witness said that the clinic didn't really have medical supplies. There was testimony about the large number of the same kinds of tests or same diagnoses. That would be very peculiar. Right. And of that name. What about that testimony? So, great points. And so what is the significance of those pieces of testimony? As a layperson, how do I interpret that testimony? Do I know whether that's normal or whether it's not normal? And Special Agent Koontz is the person who told me why that's not normal. Now, as to the specific things. Because they're red flags, right? Right. Because those are the red flags. Right. And so that was the way. The government knew what these people were going to testify to before trial, which is why they called Koontz at the beginning of evidence, had him set out the red flags, then had the people testify to the red flags, and then referred back to his test again and said, look, we proved it because Koontz told you what to look for and these people said it. With respect to whether or not the clinic had actual supplies, that was testimony given by Dr. Bascoy's assistant at a different clinic. When you actually look at what the clinic employees said, they said that it was a real clinic that provided services. I understand it was contradicted testimony, to be sure. But, of course, we're viewing the evidence in the light we're viewing at this point after conviction, and they did hear contradictory evidence, right? Right. Exactly. Exactly. And I think, you know, the overarching point, Your Honors, is that this was a circumstantial case. There was no direct evidence. And the thread that the government used to tie the circumstantial evidence together and to give it inculpatory significance was special aides and Koontz. And when you pull the thread of special aides and Koontz, it affects everything else along with it. The other thing I want to say on the issue of prejudice on the second category is that this is even more prejudicial than the red flags testimony, which kind of spread very wide, but this is very focused. So special aides and Koontz's testimony, when he talked about the supposed role and his expert opinion that office managers play in fraudulent schemes, was, among other things, it's typically the office manager orchestrating the fraud and hiding it from the medical people in the clinic. It was the office manager has an active role in the medical practice of the clinic and will dictate to the physician or the physician's assistant what types of services they need orders for. That the office manager is controlling the finances of the fraudulent clinic in almost every case, regardless of the evidence. I mean, that would be bad enough if the government just let it sit in evidence, but then the government went back to it again using Koontz in closing and rebutted the court of Sarkeesian's defense. So his defense was there wasn't fraud happening, but if there was fraud happening, I'm the office manager. I'm not involved in the medical care that's going on. That's something that happens with the physician's assistants and with the doctors. And if there's any question to that, government excerpt of record 1312 and 1347 are the clinic employees saying that Sarkeesian had nothing to do with the medical care inside the clinic. Right. So AFTI makes what is a very damaging statement, pointing the finger to a typical scheme, which would be expert testimony, and the typical scheme is the office manager. I'm shamelessly paraphrasing, but there was an opportunity to cross-examine this person about how do you know that, has that been true in other cases. What does the record show about what happened there? I don't remember the exact cross-examination on those points, Your Honors, and so I apologize. But, yes, there was an opportunity to cross-examine it. And as soon as I say this last thing, I want to return back to something else. So here's the way the government used that testimony in its closing to rebut Sarkeesian's court offense. What the government said was, quote, Special Agent Koontz also talked to you about who perpetuates the frauds in these places. Sometimes it's the owner or manager who perpetuates the fraud, and oftentimes that person will hide it from the doctors or others at the clinic. I mean, what that is is the government putting an agent on the stand under the guise of expertise and having that agent say, people who do what Sarkeesian does are almost always guilty of the crime. That's pretty damaging. That's pretty prejudicial. Now, as to your question about the cross-examination, that actually gets to the broader point, which is all of Koontz's testimony is not admissible in this case under Barabin. So I don't know if there are questions about that, but do you want me to speak to that issue? No. You've made the argument in your brief. Okay. At this point, I guess, so I've talked about the first two categories, and I think if you consider the red flags testimony, which then wrapped in all of the circumstantial evidence the government used in this case, it's clearly prejudicial. It requires reversal. When you use the role of the office manager testimony, which is extraordinarily prejudicial, that requires reversal. When you take those two things together, Your Honors, this case has to go back. I want to turn now and talk for a little bit about the government's improper rebuttal. And I think the important thing to know about the government's rebuttal argument is that the government has kind of a template that it uses for health care fraud cases. And it tried to map that template onto this case, but the facts didn't fit. So the template is the patients don't actually need medical care, because if they needed medical care, then it would just be Medicare. It wouldn't be Medicare fraud, right? That's just the normal way that health care works. So in order to get them into the clinic, you need to pay them cash. Once you have them in the clinic, you can use them to bill Medicare, and then once Medicare remits payment to your account, you need to make that into additional cash to get more people in the door. So that is the ecosystem, right? And it's fueled by the payment of cash kickbacks, which is why the kickbacks were so essential to the government's case. It's why the government talked about them in pretrial hearings. It's why the government said in opening it promised the jury that it was going to see this ecosystem at work. But is your argument really that there was no evidence about ecosystem that would have allowed the prosecutor to make that argument? No. Here's my argument. So the government said two things in closing, right? Number one, it said that Sarkeesian was paying for patients, that he was making pro-rata patient referral payments, right? And number two was that the patients themselves said that they got cash to come to the clinic. Those were the two statements that the government made in closing. And the best evidence that they have on that, Your Honors, are two pieces, right? So there were clinic employees who said that Sarkeesian used to pay Arturo, and they would talk behind a closed door. The driver. Right. The problem with that is that Sarkeesian, as the office manager, did the payroll. He was responsible for paying everybody. The other more important problem is that, as the government prosecutors well know, but the jury probably didn't, there's a huge legal difference between paying a person's salary, even if that person is known as a marketer, and paying that person for pro-rata patient referrals. And the government had evidence of number one. They didn't have evidence of number two. And you can only stretch the fair argument rule so far. The second piece of evidence was the testimony of its cooperator, Gerard Rustamian. And Rustamian's testimony was that he's a liar, that he lies when it suits him, and that during 16 pretrial interviews he didn't say anything about Sarkeesian saying anything about needing cash. The important thing about his testimony, a couple things. Number one, when he was pressed on cross, well, when did Sarkeesian say this to you, this statement about needing cash to pay patients? He said, I can't possibly remember. How can you even ask me that? It was so long ago. That's important because, and that's cited in our opening brief, it's in a footnote, that's important because Sarkeesian and Rustamian knew each other both during and after the Sunset Clinic. And Sarkeesian worked at health care clinics both during and after the Sunset Clinic. So even if you credit that statement, there's nothing to take that statement untethered from time and to convert it into a statement about paying patients at the Sunset Clinic. So you think it's not a fair argument? Not a fair argument, but this is the more important point, actually. So what the government didn't say in its closing was our line cooperator, Gerard Rustamian, who said that he lies when it suits him and didn't say this during 16 pre-trial interviews, he said that Sarkeesian paid these patients. What the government said in closing was that the patients said that they got paid. That's critically important. And this goes right, as I was saying, as I was explaining, the payment of kickbacks is core to the government's theory of this case. And then when you combine that with Kuntz's testimony, which is all wrongly admitted, and he tells the jury, well, find that kickbacks have occurred even without evidence, and then the government in closing says, well, we proved to you kickbacks, but there's no evidence to support that. When you combine those two things together, they amplify and they create this, I would say, an untenable danger that the jury would have found that kickbacks had been proven even without evidence. Your Honors, I'm well into my reserve time. I'd like to ask one more. I just have one quick question, counsel. Did you request the trial court give the Ninth Circuit model jury charge for dual fact opinion testimony? I do not believe that we requested it, although when you look at the pattern instructions, what the pattern instructions say is that in a criminal case it's clear error. And actually there's a case, and I'm blanking on the case name, but even in that case where the defendant objected to the dual role instruction and the court failed to give it, the Ninth Circuit said clear error. Thank you. Good morning, Your Honors, and may it please the Court. Kathy Ostler for the United States. I'd like to address one issue right off the bat that's a factual dispute, or at least that it sounded like a factual dispute, and this is regarding Special Agent Kuntz's testimony. Let's be clear on two things. Special Agent Kuntz was testifying solely as an expert. He was not testifying as a percipient witness, and he made that very clear that he was not testifying as a percipient witness. He made it clear? Yes, he did during his testimony. We cited some examples of that in our papers. You did? I just wanted to make sure that I heard you correctly today. You're relying on that because I've got those sites. Is that okay? Yes, Your Honor. Thank you. And secondly, the expert instruction that was given was a model instruction. It was based on the model instruction for expert testimony. Initially, the model instruction had a placeholder for the name of the expert. The government, at the end of the case, suggested that the Court put in Special Agent Kuntz's name into that instruction. The defense actually said, no, Your Honor, there were lots of people who testified. We think you should just make it vague and say persons and not name any individual by name. And that is, in fact, what the Court did. So the district court actually took the defense's proposed expert instruction. No one asked for a dual instruction, and, frankly, nobody testified as a dual witness. Special Agent Kuntz certainly did not. And I would argue that the two other special agents who testified, who are referenced in the papers, were not testifying as experts either. They were lay witnesses who were testifying under Gadsden, under Berrigan, based on their own personal knowledge of events. I also would like to address the fact that Special Agent Kuntz's testimony was repeatedly referred to by Mr. Snyder as inadmissible, improper. In fact, it's modus operandi testimony, which has been repeatedly upheld by this Court several times, even most recently in the healthcare fraud context, in the unpublished opinion in Chernofsky, which came out earlier this year. The cases are very clear on this, that if there are facts that independently might seem innocuous, but when strung together reveal a modus operandi of a scheme or a conspiracy, usually in the drug trafficking context, that's true, but again, in healthcare fraud in Chernofsky, then that testimony is admissible if the agent who's testifying has the experience to testify about it. The concern that this Court has raised repeatedly is when you have the same witness who's providing that testimony and also was involved in the investigation and is testifying as a precipient witness. That did not occur here because Special Agent Kuntz could not have been more clear that he was not involved in the investigation of this case. Now, I do want to address the Berbin error, which was asserted by my opponent many times, but not actually addressed in argument today. The Court's concern here and the defense's argument has been that there were not explicit findings made on the record about Special Agent Kuntz's expertise and whether he was relevant, his testimony was relevant and reliable. And in fact, I would submit to the Court that the District Court did make implicit findings of relevance and reliability. Where should we look? I would suggest to the Court that when you look at the oral argument on the motion in Lemonade and look at what the Court did in that context, first thing the Court did is he acknowledged that he had reviewed all of the materials. He said, you know, I want to make sure I've heard everything. So what does that mean? What is he looking at? He's looking at 200 pages of material on Special Agent Kuntz in particular, other interview reports that he gave, prior testimony that even defense counsel said was virtually identical to the testimony that he gave here in the Aniazi-Smith case, which is referenced in the papers, in our papers. He had his CV, his resume that he could have asked about. So he established that he had reviewed all of this. He established that the defense did not file a reply brief. And then he was aware, based on our papers of Judge G's ruling the prior year in the Aniazi-Smith case, that Special Agent Kuntz was a reliable expert for modus operandi testimony. And based on all of that, the Court considered all of that. He asked specific questions tied to the law on modus operandi. He asked about the Ninth Circuit law in this area. He asked about the other district courts. And the defense admitted that there were no district courts excluding this kind of testimony, excluding Special Agent Kuntz in particular. And then he listened to oral argument. He listened to oral argument twice from the defense. He listened to it as well from the government. And at the very end, he said, I've heard enough, which basically our impression at that point was that he was saying, I've read all your papers. I know what your arguments are. I disagree with you. This is not a question about relevance, because clearly this testimony was relevant. No one disputes that. And frankly, it wasn't really a question of reliability, because Special Agent Kuntz had 20 years of experience. He had been doing health care fraud cases, hundreds of them. He had testified almost down to the explicit word what he said in court. But I think your argument today is different, somewhat different. I'm not sure. Maybe you could just clarify. Are you arguing that certainly that he was always an expert, that was your intention and theory and even tried to put his name in the jury instruction? Yes. Are you arguing there were no other experts presented? I would argue that none of the other individuals that we presented were in fact experts. We provided for the case. Forgive me for interrupting, but if that's the case, that's my understanding of your argument. And so what do I do with the testimony about the district court who made, again, I'm going to paraphrase shamelessly, but he made a statement about to the effect that he felt like expert testimony had been offered left and right. You know the one I'm referring to with the offhand remark that I'm not paraphrasing. There's expert opinions all over the place. All over the place, he said, all over the place. What do we do with that? So, Your Honor, I would submit that to the extent that those are addressed in the defense's brief, what you have there are examples of lay witnesses, lay witnesses who maybe occasionally threw in an expert statement somewhere along the way. That's how it reads. And I would refer the court back to Gadsden, Gadsden on this point, because what Gadsden says is, look, in Vera, we were worried about somebody who comes out there as an expert and then starts talking about lay witness testimony, precipient witness testimony, and the jury knows that this person is an expert, and now they're hearing about precipient witness, and they think, oh, my gosh, you know, I guess I should give it a heightened sense of importance because this person's an expert. Here, you don't have that. You have people who were lay witnesses who maybe threw in an expert statement, and I would suggest to the court that at least with Special Agent Keveny, those statements, to the extent they were made at all, were invited by the defense because they came out on cross-examination, and then I circled back on redirect. And then with Special Agent Tweet, it was cumulative of things that other witnesses had said. So setting that aside, in going back to Gadsden, these are lay witnesses. They're not being held out to the jury as experts, and they slip in something insignificant there and that would constitute an expert statement. And Gadsden says that's okay. That's okay. I do want to get back to one question, though, about the findings because I think it's important that the court understand that, you know, based what Barabin says is that if this court is not satisfied with the findings that were made, it can go back and do its own findings. And, in fact, it has done that. And it acknowledged that, again, in the criminal context in the Christian case, which is cited in defendant's reply brief. And it's also most recently in the Gonzales-Robles case, which was an unpublished opinion, 603 Fed Appendix 558 at 561, 9th Circuit, 2015. That's a modus operandi case. And the court looks at what the district court did, and then it makes its own finding and says, based on our review of the record, this expert witness, this agent, his testimony was reliable. So I submit to the court that if you're not happy with what Judge Gutierrez did in making findings, this court can go back and look at all of the materials we provided and make its own decision about Special Agent Kunz's reliability. I'd also note that the Pyramid Technologies case that the defense cited, that's exactly what the court did. In that case, the judge had thrown out three expert reports, and the 9th Circuit, this court, went back and said, let's look at these three experts. What are their qualifications? What are they testifying about? What did they do? Now, those are more of scientific experts, unlike law enforcement. As Hankey suggests, law enforcement may be treated differently than typical scientific experts. But the court, this court, went back and did that and did that reliability analysis and said, you know what? The district judge got it wrong. Two of those experts should have been allowed to present their reports in opposition to the summary judgment motion. So I submit to the court that even if you're not happy with what Judge Gutierrez did, this court can go back and make its own determination. I'd also like to address the dual instruction issue. Okay. Just very briefly, Taralba Mendia is the case, I believe, that the defense was looking for. And in that case, it was plain error because the court did not sua sponte ask for a dual instruction, dual role instruction. But again, as I said here, we don't have any witnesses who truly were testifying in a dual role capacity. Gadsden speaks to the issue of when it slips in there, we don't worry about it as much when it's a lay witness who says something that sounds kind of expert-y. Especially here, where at least as to the two doctors that testified and the two main Medicare witnesses for whom we provided protective notice, we said, look, we don't think they're experts. But in case you do, here's all their expert stuff. What does that mean? Does that mean we don't anticipate using them as experts? Right. We're not calling them as experts. And is your position that was your intent and this got slipped in? I just want to make sure I fairly understand what happened. Yes, certainly, Your Honor. We, the government's position on that was that the two Medicare witnesses were testifying about how Medicare works, what Medicare considers important, and as the victim, they were talking about what is material to Medicare. And that, there's case law which is cited in our papers that establishes that that's recipient testimony. That's lay witness. Was that true of the nurse as well? Ms. Barbara Talent, I believe, is the one you're talking about. Yes, same thing. But I would note from Ms. Talent that she's part of a jury instruction that said don't consider any of this evidence as to Defendant Sarkisian. It only applies as to Defendant Boghossian. Oh, right. That's right. Okay. Thank you. So I just want to clarify that. Okay. I'm trying to clarify that, too. Whitten, Weber, Talent, Jimenez, and Om. All right? So Weber. These are the protective notices that you are referring to? Right. These are the witnesses that? We provided five protective notices for Whitten, Weber, Talent, Dr. Jimenez, and Dr. Om. But is it correct that Whitten and Weber had no firsthand knowledge of the case? That's correct. They did some, in preparing for trial, they did gather some materials for us, but they were not intimately involved in the case. But doesn't that make them expert witnesses? Not according to the case law, Your Honor, because the case law talks about their capacity as Medicare employees who are educating the jury about Medicare and how it works, and to show that Medicare was, in fact, defrauded here, because had Medicare known X, it would not have paid these claims. In the hypothetical. Correct. And the Ranney case, I believe, is the one that discusses that. The Phillips case in the Ninth Circuit, the Ranney case in the First Circuit, and where the government has to prove materiality, they can call lay witnesses who can say, this was important to us, we would have liked to have known that, in fact, these patients were not coming to the clinic. Yes, but these are not firsthand knowledge, so they can't say that. I'm talking about the ones that you presented that you're saying are not experts, but indeed they were, aren't they? Even if they're an expert on Medicare procedure. We submitted to the defense that we did not consider them to be experts. We were aware that Judge Gee had found Jody Witten, in fact, to be an expert the year before in the Aniazi-Smith case. We do not believe them to be experts because of the cases like Phillips and Ranney and Bush that I mentioned to you, and also the Fireman's Fund and Hairston cases, which talk about witnesses discussing organizations' practices. Those are in our papers as well. Isn't that kind of a tough sell? We wouldn't expect a jury to know what is or is not material, right? Well, that's why you need somebody who can say this is material, because it's the burden of proof on the government to show. I understand why you need it. The question is, why isn't that expert testimony? We believe that based on this case law that talks about how these witnesses, because they're speaking about their experience as Medicare employees, that they're talking in the context of what is Medicare as a whole. Medicare as the victim think is material. That's not expert testimony. But I will say that even if it's not expert testimony, we provided expert disclosures for these witnesses to the nth degree. You mean even if it is expert testimony? I'm sorry. Even if it is expert testimony. We provided expert disclosures. For Jody Witten, who had testified many times, again, almost identically to how she did it here, we provided the same kinds of materials that we provided for Special Agent Kuntz. Prior testimony, prior witness interviews, a CV, hundreds of pages of materials. We provided the doctor's interview reports and their CVs. All of this material was provided in order to give the defense the ability to challenge them as experts if it wanted to, and also to cross-examine them when the time came. So they had that information. And then at the end of the day, they got the instruction they wanted, which basically said, to the extent you heard something that sounded kind of expert-y, jury, this is how you evaluate it. You don't treat it any differently than anything else. Do you have another question, Judge? Yeah. Just on money laundering. Yes. Did you present Special Agent Kuntz as the money laundering expert, and did you notice him for that? We did not identify him as a money laundering expert. What we said and what was clear from our papers is that, and the letters we provided, the disclosures, was that money laundering plays into health care fraud because of the kickback issue. And so we put them on notice that he would be talking about kickbacks. He did talk about kickbacks because it's important for a jury to understand that you can't pay a patient to come to your clinic. Now, I would like to address that point because that ties right into the rebuttal argument that my opponent made. The rebuttal argument, if you look exactly at what my colleague said, she said that what did Defendant Sarkisian do with the cash? This is at GER 2844. You know that he was paying the marketer. That's Arturo. Marketer, by the way, was his word, and she says that. She says he described Arturo as a marketer. You know that he was paying the marketer. You know that from the clinic employees. The two employees, Perez and Del Carmen Lopez, testified that they saw him paying the marketer, or at least that he paid everybody, including the driver, and at least some of them said he was called a marketer. Sarkisian called him a marketer. That's what he did. He went out and picked up patients off the street and brought them to the clinic. Arturo was finding patients off the streets. You know that he was paying them because that's what they told you. Who was paying who? The only thing in that sentence that talks about paying was Sarkisian paying the marketer, and the only thing about what somebody told somebody was what the clinic employees said about paying the marketer, paying all the employees. So, look, if we're in the area here where we're talking about pronoun references, that is the only place that there is any indication of paying for patients, paying patients to do anything. There was no evidence about paying patients directly, but Rostamian testified that Sarkisian told him he needed cash for paying the patients. And I said, what do you mean by that? Did he say for paying the patients? He actually said, and this is at, sorry, I have it right here. That's okay. It would be helpful. It's at GER 2058. Okay. I asked him, did he say why he needed your help to take out the cash? He said, during our conversation we sometimes talked about that, and in my understanding it was for paying the patients or the doctor. And then I said, when you say paying the patients, what do you mean? And he says, sometimes these clinics, they have patients that they get paid for accepting, taking medical tests and cooperating with the clinic for making some medical examinations. And then I clarified. So paying patients to come to the clinic, is that what you understood? Yes. Now, I would say that Special Agent Koons testified that sometimes they weren't paid, they were offered free medical equipment. And, in fact, one of our beneficiaries, one of our patients, Mr. Ponce, testified, and again we cited it in there, that he was, in fact, offered medical equipment. Counsel, your time is ticking, and I wonder, could I get your response on the sentencing loss calculation? Yes, Your Honor. Your Honor, as far as sentencing is concerned, I believe that we are clearly in the realm of preponderance of the evidence standard here, because the $1.2 million, which includes not only the claims that were billed by the Sunset Clinic, but also the claims that were referred to outside providers who then billed, that $1.2 million is clearly within the scope of the health care fraud scheme  When you're within the scope of the scheme, the cases that we cited, they speak to the issue that that is preponderance of the evidence, it's not clear and convincing standard. And so we are well within that ballpark when we're talking about the extent of the scheme. This is not uncharged conduct. It was all right in the indictment that these referrals were going out. But I thought you agreed at the time, didn't the government agree at the time that it ought to be the $400-some-odd-thousand loss calculation? So that is the paid amount, Your Honor. Yes, I know it's the amount paid, not the amount billed, but I thought you agreed that the government agreed that that's the correct amount. No, that is not the case. What we did was we still believe intended loss is the billed amount, $1.2 million. However, after the defense submitted a declaration from Mr. Sarkeesian under the Popoff case, we went back and we said, okay, if you give credence to that, which the district court That being, just to be clear, that being his statement, that he knew that the amount billed was not always the amount paid. Correct. Okay. We went back and we recalculated the amount, but it still didn't come out to $450,000, which was the paid amount, because we included claims in there that were submitted but denied, right? Yes. And so it was more like $600,000. You're using intended. Yes. Because they were submitted and denied, but you weren't using $1.2. Right. Because we took him at his face value that we took his declaration at face value that he knew the rules. The judge obviously did not buy that because of the inconsistent positions that the defense took at trial where he was saying, I don't know anything about billing. You know, obviously he didn't testify. How do I know what the judge did with that? I thought the record was tough. It was tough for me to figure out what the judge thought about that. I wasn't sure that the judge had raised any objections, made any rulings on the objections at sentencing. Well, they actually did not object on that amount, Your Honor. In fact, the PSR, the pre-sentence report statements were largely uncontested. And so the $1.2 million was there. The government did submit that lower number based on the pop-up declaration, but the court went with a probation's recommendation that the intended loss amount was $1.2 million. So the court implicitly rejected the defense's pop-up declaration. And could have done so easily because of the inconsistent positions the defense took. I would suggest also Reyes speaks to that, that if the court doesn't follow the government on a sentencing recommendation, it's okay. The district court's allowed to do that. I didn't mean to interrupt you. I'm sorry. No, you didn't. It's fine. Probably I interrupted you, I bet. But here's a – if you could just get your response. It seems to me the court, in agreeing with – this is the court. In agreeing with the probation report, the court agrees with the aggregate dollar amount of the claims submitted to Medicare by defendant as manager of the Sunset Clinic, and then he gives the $1.2 million number, more specifically than that, and that the amount was actually paid was $451. Correct. Period. Correct. That is the – And I appreciate that your position was the intended amount. That's not here. I don't have the judge commenting on that actually at all. Well – And then we get this judgment. So how do I know what the judge did? The judge went with probation's recommendation, which was our initial recommendation, that the intended amount was all of the claims billed. And the answer to how I know that is just because there's an absence, and then he – that he's stating clearly that he understands X and he understands Y, makes no mention of the government's position, and then adopts the PSR. Well, in adopting the PSR, he's not – he's essentially rejecting the – Yeah, so it's not a trick question. I'm trying to make sure that I understand that you're just asking me to draw that inference about his reasoning because that's the number on the judgment. There's – I mean, he didn't – did he mention it anywhere else in the transcript that I'm missing? Not that I'm aware of. Okay. That's what I'm trying to ask. Not that I'm aware of. Thank you. Thank you. I'm sorry to have gone over. We took you over. Thank you for your argument. We're going to just hear from opposing counsel briefly. Your Honor, just a couple quick points in response. I know my time is short. So staying on Special Agent Kuntz, because this is really a critical issue. One of the arguments that the government made is that you can rely on the district court's implicit findings. We went through all the cases in our reply, and I would invite, you know, Judge Christin, I know you participated in City of Pomona versus SQM. At page 1069 of that decision, it reviews all of the cases before it, and it makes clear that this is not about the quality and the quantity of the evidence that was before the trial court when the trial court didn't make express findings. It's about trial courts actually exercising their discretion in a meaningful and perceptible way. So that's point one. That's the Barabin error on point one. Second point, the government says that you can consider substance of invisibility for the first time on review. That's directly contrary to Barabin. So Barabin is a three-part opinion. It has three Roman numerals. Roman numeral one is about error. It says that where a trial court fails to make an on-the-record finding, that's an abuse of discretion. Roman numeral two says the normal next step is you go to harmless error. And this is where you get the back and forth between Judge Nguyen and the majority opinion. And what the majority opinion says in response to Judge Nguyen's argument, which is exactly the government's argument, is the dissent contends that we must decide whether the evidence would be admissible before engaging in harmless error review. However, the dissent is reading a nonexistent step into our evidentiary error case law. I have about 30 more seconds on this one issue. Can I finish? Sure. So the court then goes on at page 466. When the district court advocates its responsibility to answer a threshold question of admissibility, that's the failure to make the finding. We need not determine whether the evidence would be admissible before we go to harmless error. The third part of that decision only applies where the verdict loser, the person who suffered the error, asks for a special remedy where the court actually enters judgment in its favor, where it says go ahead and consider substantive admissibility, find that the evidence could never have been admitted, and that without that evidence I win, and therefore enter judgment in my favor rather than the default remedy. And you can see that with the citation to Weissgram and also by just running the government's argument against section 2 of Barabin. Thank you. Thank you. Thank you both. That concludes our arguments for today, and we'll stand at recess. All rise.
judges: Tashima, Christen, Rufe